## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>*ex rel.* )<br><br>HEATHER G. WEBB, )<br><br>Plaintiffs, )<br><br>v. )<br><br>ADVANCED BIOHEALING, INC., )<br>a/k/a SHIRE REGENERATIVE )<br>MEDICINE, n/k/a SHIRE, PLC; )<br>CANAAN PARTNERS, a/k/a )<br>CANAAN VII L.P.; SAFEGUARD )<br>SCIENTIFICS, INC.; WHEATLEY )<br>MEDTECH PARTNERS L.P., )<br>CHANNEL MEDICAL PARTNERS; )<br>RED ABBEY VENTURE PARTNERS, )<br>L.P., n/k/a RED ABBEY, L.P., STEVEN )<br>BLOCH, M.D.; GARY J. KURTZMAN, )<br>M.D.; DAVID R. DANTZKER, M.D.; )<br>CAROL D. WINSLOW; MATT ZUGA; )<br>JOSEPH KLEIN; ███████████ )<br>███████████████ )<br>███████████████ )<br>███████████████ )<br>███████████████ )<br>███████████████ )<br><br>Defendants. )<br> | Civil Action No. 8:14-cv-1055-T-33EAJ<br><br>**FILED UNDER SEAL**<br>**PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>████████████████████<br>████████████████████<br><br>**JURY DEMAND** |

**THIRD AMENDED COMPLAINT PURSUANT TO 31 U.S.C. §§ 3730(e)(4)(B) AND 3730(b)(2) DISCLOSING MATERIAL EVIDENCE FALSE CLAIMS ACT COMPLAINT AGAINST DEFENDANTS, ADVANCED BIOHEALING, INC., a/k/a, SHIRE REGENERATIVE MEDICINE, a/k/a, SHIRE, PLC; CANAAN PARTNERS, a/k/a, CANAAN VII L.P.; SAFEGUARD SCIENTIFICS, INC.; WHEATLEY MEDTECH PARTNERS L.P.; CHANNEL MEDICAL PARTNERS; RED ABBEY VENTURE PARTNERS, L.P., a/k/a, RED ABBEY, L.P.; STEVEN BLOCH M.D.; GARY J. KURTZMAN, M.D.; DAVID R. DANTZKER, M.D.; CAROL D. WINSLOW; MATT ZUGA; JOSEPH KLEIN;** ████████████████████████████████████████████████████

**BY RELATOR, HEATHER G. WEBB**

TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA:

MAY I PLEASE THE COURT:

## I.
## INTRODUCTION

1.     A Third Amended Disclosure Statement has been voluntarily provided to the Government before the Relator files this, her Third Amended Complaint, Under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, submission of the Third Amended Complaint and Disclosure Statement does not constitute an admission that any of the information upon which Relator's False Claims Act fraud claims are based was publically disclosed.  The anticipated suit involves violations of the False Claims Act by Advanced BioHealing, Inc., a/k/a, Shire Regenerative Medicine, a/k/a, Shire, PLC; Canaan Partners, a/k/a, Canaan VII L.P., ("Cannan"); Safeguard Scientifics, Inc., ("Safeguard"); Wheatley MedTech Partners LP, ("Wheatley"); Channel Medical Partners, ("Channel"); Red Abbey Venture Partners, L.P., a/k/a, Red Abbey, L.P., ("Red Abbey") and Stephen Bloch, M.D.; Gary J. Kurtzman, M.D.; David R. Dantzker, M.D.; Carol D. Winslow; Matt Zuga; Joseph Klein; ████████████████████████████████████████████████  ████████████████████████████████████  The violations of the False Claims Act arise because said Defendants from February 2007 through at least 2012 knowingly and intentionally created, funded or engaged in, or directed, or conspired, combined and agreed to create and engage in, unlawful marketing schemes to sell the Dermagraft product in violation of the False Claims Act, the Anti-Kickback Statute, Medicare and Medicaid certification requirements and to market and sell the Dermagraft product "off-label" for purposes and uses for which it was not approved by the United States Food & Drug Administration.  Additionally, the Defendants sold and marketed or conspired to sell and market Dermagraft "on the spread," which was the difference between the

Medicare reimbursement amount and the actual cost of the product. Such wrongful conduct by the Defendants occurred throughout the United States beginning at least in February 2007 and continuing until 2012. The Relator has firsthand knowledge of the said wrongful and fraudulent schemes because she was employed by Advanced BioHealing, Inc., ("Advanced BioHealing"), as a sales representative based in Nashville, Tennessee with a sales territory in Tennessee and Kentucky from June 18, 2007, through June 27, 2008. The Defendants attempted to influence and coerce the Relator to employ the said wrongful and fraudulent marketing schemes and to employ other practices, which violated the Anti-Kickback Statute, Medicare and Medicaid rules and regulations and Food & Drug Administration rules and regulations to improve her sales to customers and prospects in her Tennessee and Kentucky sales territories during 2007 and 2008.

### JURISDICTION AND VENUE

2.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* as amended by the Fraud Enforcement Recovery Act of 2009, effective date May 20, 2009, ("FERA"), and the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as enacted and enforced before May 20, 2009. This court has jurisdiction over this case under 31 U.S.C. §§ 3732(a) and 3732(b). This court has jurisdiction under 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

3.      Venue is proper in this district under 31 U.S.C. § 3732(a) and 28 U.S.C. §§1391(b) and (c), because at all material and relevant times Defendants transacted business in this district and

████ ██ █████████████████████████████████

### THE PARTIES

I.      RELATOR: HEATHER G. WEBB

4.      Relator, Heather G. Webb, ("Webb"), is a citizen of the State of Tennessee residing at: 1401 Mentelle Drive, Franklin, Tennessee 37069. Relator is an "original source" of the information contained in this document within the meaning of 31 U.S.C. § 3730(e)(4)(B), but states

that to her knowledge the information contained herein concerning the Defendant's alleged False Claim Act violations has not been publically disclosed.

5.        Webb graduated from Belmont University in Nashville, Tennessee with a Bachelors of Science Degree in 1996. Since graduation she has been employed in pharmaceutical and medical device and equipment sales with Mediq PRN, (1996-2003), selling capital equipment to hospitals; Sanofi, (2003-2005), where she received on-going training on the Pharma Guidelines; Ethicon (Johnson & Johnson), (2005-2007), where she received on-going training on the AvaMed Guidelines; Advanced BioHealing, Inc., (2007-2008), where she received little to no training; EndoCare, (2008-2009), where she trained on Avamed Guidelines and the Stark Law; Watson Pharma, (2009-2010), where she received additional on-going training on Pharma Guidelines; and, HealthTronics, (2010 to present), where she received on-going training on Avamed and the Stark Law.

6.        From June 18, 2007, to June 27, 2008, Webb was employed by Advanced BioHealing as a sales representative in the states of Tennessee and Kentucky. Her title with the company was "Advanced Technology Specialist." Webb's duties in her territory included sales and marketing of Advanced BioHealing's wound healing product, Dermagraft, to physicians, wound care centers, surgery centers, podiatrists, hospitals and other health care providers.

II.    DEFENDANT:        Advanced BioHealing, Inc.

7.        Defendant, Advanced BioHealing, Inc., which on July 18, 2012, changed its name to Shire Regenerative Medicine, is, and was, headquartered at 36 Church Lane, Westport, Connecticut 06880. In May 2006, Advanced BioHealing acquired a regenerative medicine business from Smith & Nephew which included as its primary product, Dermagraft, a bio-engineered skin substitute used to treat diabetic foot ulcers. In 2003, Smith & Nephew had acquired ownership of the global rights to Dermagraft and related technologies and assets from the Chapter 7 Bankruptcy Estate of Advanced Tissue Sciences, (ATS), the original developer of Dermagraft. Smith & Nephew tried unsuccessfully

- 4 -

to commercialize the Dermagraft technology and ultimately sold the same rights and assets it had acquired in 2003 to Advanced BioHealing in 2006.

8.      According to press releases by Canaan Partners, the idea for Advanced BioHealing, "was born in the Westport, [Connecticut] office of Canaan General Partner, Stephen Bloch." Canaan succeeded in guiding its "Executive in Residence," ████████ into the CEO's role at Advanced BioHealing along with Canaan's own Dr. Stephen Bloch the Chairman of the Board of Directors at Advanced BioHealing beginning in 2005.

9.      Dermagraft consists of a bio-absorbable mesh scaffold that can be seeded with human fibroblast cells, which grow on the scaffold, secreting collagen and other substances resulting in a three-dimensional skin substitute made of living cells. Approximately 80 percent of the patients receiving Dermagraft therapy were either Medicare or Medicaid patients. In 2007, Advanced BioHealing had revenues of $8.6 million. Its revenues increased to $46.5 million and $85 million, respectively, in 2008 and 2009. In 2010, its reported annual revenues grew to $147.7 million and $200 million in 2011. The total addressable market in the United States for Dermagraft according to published reports from the company is approximately $3.0 billion dollars.

**III.    DEFENDANT:      Shire Regenerative Medicine and Shire PLC**

10.     Shire Regenerative Medicine, ("Shire Regenerative"), is a wholly owned subsidiary of Shire PLC, ("Shire"). Shire Regenerative, which is headquartered at 36 Church Lane, Westport, Connecticut 06880, purchased Advanced BioHealing in May 2011 for $750 million. Sbire's registered office is located at No. 99854, 22 Grenville Street, St. Helier, Jersey JE4-8PX, with its home office at 5 Riverwalk, Citywest Business Campus, Dublin 24, Ireland.

**IV.    DEFENDANT:      Canaan Partners, a/k/a Canaan VII L.P.**

11.     Defendant, Canaan Partners, a/k/a Canaan VII L.P., ("Canaan"), is a venture capital firm with headquarters at 2765 Sand Hill Road, Menlo Park, California 94025. The firm also has offices in Westport, CT, India and Israel. Founded in 1987, Canaan has over $2.4 billion capital

under management and has invested in more than 240 companies, completed 63 mergers and acquisitions and brought over 50 companies public. Canaan describes itself as, "seasoned investment professionals with deep domain expertise, extensive relationships with the world's leading companies and entrepreneurs, and a solid track record of building valuable technology and healthcare companies that are uniquely meaningful to society." Canaan Partners are proven venture capital company-builders . . ." According to press releases, "Canaan basically resurrected Advanced BioHealing's product, called Dermagraft . . . Canaan and some other investors obtained rights to the product, [Dermagraft], and started Advanced BioHealing . . ." ". . . Canaan stepped in to restart the business [Dermagraft] for the third time." "Smith & Nephew was ready to sell the Dermagraft business to Canaan by 2006 after spending three years and millions of dollars more in a second bid to commercialize the technology." Canaan placed its Executive in Residence, ███████, into Advanced BioHealing's CEO position in 2007 and Dr. Stephen Bloch into position as chairman of the company's board of directors in 2005. Canaan provided at least $15 million in financing to Advanced BioHealing and realized at least $225 million - a 15X return on cash invested - when Shire purchased the company for $750 million in May 2011. Canaan's web page has touted that startups such as , ". . . Advanced BioHealing were all brought to life with a little Canaan-styled care and seeding."[1]

## V.    DEFENDANT:    Safeguard Scientifics, Inc.

12.    Defendant, Safeguard Scientifics, Inc., ("Safeguard"), is a venture capital firm with headquarters at 435 Devon Park Drive, Building 800, Wayne, PA 19087. Since its founding in 1953, Safeguard has provided capital and operational support to entrepreneurs and startup businesses. Safeguard provided such operational support and oversight to Advanced BioHealing beginning in 2007 when it began investing in the company and had Gary J. Kurtzman, M. D. appointed to its board of directors. Dr. Kurtzman remained on the Advanced BioHealing board of directors until May

---

[1]    See Exhibit A, Canaan Partners press releases.

2011. Safeguard has completed more than 100 merger and acquisition transactions and brought over 20 companies public. Safeguard provided at least $11 million in financing to Advanced BioHealing and realized at least $145 million - a 13X return on cash invested - when Shire purchased the company for $750 million in May 2011. Safeguard press releases at the time stated that: " Safeguard partner company, Advanced BioHealing was acquired by Shire . . . ." Safeguard repeatedly described Advanced BioHealing as its "partner company." [2]

## VI.     DEFENDANT:       Wheatley MedTech Partners LP

13.     Defendant, Wheatley MedTech Partners LP, ("Wheatley"), is a private equity, venture capital firm with headquarters at 80 Cuttermill Road, Great Neck, New York 11021. Founded in 1992, Wheatley has invested in more than 150 companies and publically professes to "work closely with entrepreneurs to build successful businesses and typically support our portfolio companies at all stages of development." Wheatley provided such support and oversight to Advanced BioHealing by having David Dantzker, M.D. appointed to its board of directors in 2005 when Wheatley initially invested in the company.  Wheatley provided at least $5 million in financing to Advanced BioHealing and realized at least $70 million when Shire purchased the company for $750 million in May 2011. [3]

## VII.    DEFENDANT:       Channel Medical Partners

14.     Channel Medical Partners, ("Channel"), is a venture capital company head-quartered at 5750 Old Orchard Road, Skokie, IL 60077. According to its website, "The firm has a demonstrated record of success in not only providing capital, but in enabling and ensuring the commercial success of its portfolio companies." Channel invested approximately $2 million in Advanced BioHealing in February 2007, at which time Carol D. Winslow, Channel's principal and

---

[2] See Exhibit B, Safeguard Scientifics press releases.
[3] See Exhibit C, Wheatley MedTech Partners press releases.

founder, was named to Advanced BioHealing's board of directors. Channel realized approximately $30 million when Shire purchased the company for $750 million in May 2011.[4]

**VIII.   DEFENDANT:      Red Abbey Venture Partners, LP**

15.     Red Abbey Venture Partners, LP ("Red Abbey"), is a venture capital company headquartered at 2330 West Joppa Road, Suite 330, Baltimore, MD 21093. Red Abbey was founded in 2004 as a life sciences investment firm. Matt Zuga was a founder and managing member of Red Abbey, which invested approximately $1.2 million in Advanced BioHealing in February 2007. At that time, Mr. Zuga became a board observer to Advanced BioHealing's board of directors. Red Abbey realized approximately $18 million when Shire purchased the company for $750 million in May 2011.[5]

**IX.    DEFENDANT:      Stephen Bloch, M.D.**

16.     Defendant, Stephen Bloch, M.D., ("Dr. Bloch"), is a practicing physician, specializing in diagnostic radiology, with a professional office at 4 Hen Hawk Lane, Westport, CT 06880. He has been a general partner at Defendant, Canaan, since 2002 where his focus has been on investments in biopharmaceuticals, medical devices and diagnostics and healthcare infrastructure. In May 2011, Dr. Bloch was serving on the board of directors of: Advanced BioHealing, Liquidia Technology, Inc., Cylex, Inc., Marinus Pharmaceutical, Inc., and DICOM Grid, LLC. His previous board of director affiliations have included: Americus Therapeutics, Inc., Omnisonics Medical Technology, Inc. and Viacor, Inc. Before joining Canaan in 2001, Dr. Bloch founded Radiology Management Sciences, Inc., where he was CEO from 1994 - 2001. He also co-founded TeleRad, Inc., a tele-radiology services company. Dr. Bloch has extensive experience at the board level with biotechnology companies and as a venture capitalist in the biotechnology and medical device industry. Dr. Bloch also has extensive experience evaluating financing alternatives and strategic

---

[4]   See Exhibit D, Channel Medical Partners press releases.
[5]   See Exhibit E, Red Abbey Venture Partners press releases.

planning for medical device companies. Dr. Bloch has been described as the "father" of Advanced BioHealing. "The idea for Advanced BioHealing was born in the offices of Canaan General Partner, Stephen Bloch . . . ." He was a member of Advanced BioHealing's board of directors from September 2005 until the company's acquisition by Shire in May 2011. Dr. Bloch was chairman of the board during that time.[6]

X.   **DEFENDANT:**   **Gary J. Kurtzman, M.D.**

17.   Defendant, Gary J. Kurtzman, M.D., ("Dr. Kurtzman"), a board certified internist, has been an executive at Defendant, Safeguard, since 2006 where he is presently Managing Director and Senior Vice President of the Life Sciences Group. In May 2011, Dr. Kurtzman was a member of the boards of directors of: Advanced BioHealing, Alverix, Inc., NuPath, Inc., Garnet BioTherapeutics, Inc., Good Start Genetics, Inc. and Tengion, Inc. Before joining Safeguard, Dr. Kurtzman had extensive management experience at several biomedical companies including: BioAdvance, an early stage life sciences investor, where he was managing director and CEO. He also held various management positions at Pluvita Corp., Genovo, Inc., Avigen, Inc. and Gilead Sciences, Inc. He was formerly on the board of directors of Avid Biopharmaceuticals, Inc. and Molecular Biometrics, Inc. Dr. Kurtzman is currently a lecturer in healthcare entrepreneurship at the Wharton School of Business at the University of Pennsylvania in Philadelphia, PA. When Safeguard invested in Advanced BioHealing in February 2007, Dr. Kurtzman was appointed to the board of directors of Advanced BioHealing. "Dr. Kurtzman has more than 25 years of experience in operations and investments, leveraging his medical expertise to enable businesses to enhance their products and grow their services. . . ." According to the Safeguard web site, "Gary has realized value for companies through a series of successful IPOs, M&A and turnaround transactions - most recently Shire's acquisition of Safeguard's partner company Advanced BioHealing for $750 million, in cash. .

---

[6]   See Exhibit A, Canaan Partners press releases.

. ." At the time of its sale to Shire in May 2011, Dr. Kurtzman owned 2,991,418 shares in Advanced BioHealing and was paid approximately $56 million for his shares. Presently, Dr. Kurtzman also lectures in the Health Care Systems Department at the Wharton School at the University of Pennsylvania where he teaches entrepreneurship in life sciences. [7]

XI.   DEFENDANT:   David R. Dantzker, M.D.

18.   David R. Dantzker, M.D., ("Dr. Dantzker"), a medical doctor, has been a general partner of Defendant, Wheatley, since 2001. He manages Wheatley's medical technology and healthcare investments. In November 2005, when Wheatley invested in Advanced BioHealing, Dr. Dantzker was appointed to its board of directors. In fact, Shire press releases refer to him as the lead independent director of Advanced BioHealing. Dr. Dantzker has more than 10 years of medical technology portfolio management . . . and corporate board experience. He has served on faculty and in leadership positions at four major research-oriented medical schools. From 2000-2001, he was president and chief executive officer of Redox Pharmaceutical Corporation, 1997 - 2000 he was president of North Shore LIJ Health System, a large academic health system; he co-founded the Feinstein Institute For Medical Research; 1993-1997, president and CEO of the Long Island Jewish Medical Center. In May 2011, Dr. Dantzker was reported to belong to the boards of directors of: Advanced BioHealing, Comprehensive NeuroScience, Inc., OLIGOMERIX, Inc., Visionsense, LTD, Physicians for Human Rights and Surmodics, Inc. His past board of directors affiliations include: NovaRed, Inc, Valera Pharmaceutical, Inc., Agilix Corp., Versamed Medical Systems, Inc. Neuro-Hitech, Inc. before its acquisition by General Electric and Datascope Corp. before its acquisition by MAQUET Getinge Group. Dr. Dantzker has over 30 years experience as a venture capitalist focused on the medical technology industry. Dr. Dantzker owned 2,490,447 shares of Advanced BioHealing

---

[7]   See Exhibit B, Safeguard Scientifics press releases.

at the time of its sale to Shire. When the company was sold to Shire for $750 million in May 2011, Dr. Dantzker was paid approximately $46 million for his stock.[8]

## XII.   DEFENDANT:      Carol D. Winslow

19.      Carol D. Winslow, ("Winslow"), is the founder and principal of Defendant, Channel, which was formed in 1999, as a venture capital company focused on investing in medical technology and diagnostics companies. Winslow is also the founder and president of MedTech Value Creation Strategies Group, a medical and diagnostic consulting firm. From 1996-1998, she was the managing director and senior medical device analyst at Jefferies & Co., Inc.; before that she was the senior medical device analyst at Vector Securities International, Inc. and Dain Bosworth, Inc., from 1990-1996 and 1988 - 1990 respectively. From 1979 - 1988, she held a variety of positions at Medtronics, Inc. Winslow has served on several boards of directors including: Alsius Corp. before its acquisition by Zoll Medical Corp and Northstar Neuroscience, Inc. She has over 30 years experience in medical technology industry and extensive experience evaluating companies in the medical technology industry. In February 2007, when Channel invested in Advanced BioHealing, Winslow was appointed to its board of directors. At the time of its sale to Shire, Winslow was on the board of directors of Advanced BioHealing and owned 691,327 shares of Advanced BioHealing stock and was paid approximately $12.9 million.[9]

## XIII.  DEFENDANT:      Matt Zuga

20.      Matt Zuga, ("Zuga"), is currently the managing director of Zyngenta Ventures, an investment vehicle of Zyngenta Corp. a Swiss company. He was founder and general partner at Red Abbey Venture Partners, where he was responsible for managing all of the company's investments. He is currently co-chairman of the board of directors of Argenetix, Inc. and was a board observer at Advanced BioHealing from February 2007, when Defendant, Red Abbey, first invested in Advanced

---

[8]   See Exhibit C, Wheatley MedTech Partners press releases.
[9]   See Exhibit D, Channel Medical Partners press releases.

BioHealing, until 2011. He has also been a board observer at Aegerion Pharmaceuticals, Inc., Sirtris Pharmaceuticals, Inc., and Stromedix, Inc. From 1993-2003, Zuga worked as an investment banker for Legg, Mason, Wood, Walker, Inc. and was head of the life sciences group from May 2000 - December 2003. He previously worked at Raymond James & Associated, Inc., (investment banking), Southeast Bank, N.A., (commercial lending), IBM Corp., (finance), and General Motors (industrial engineering). Zuga received his B.S. in business administration from Ohio State University and his MBA from the Kenan-Flagler Business School at the University of North Carolina, Chapel Hill. [10]

## XIV.   DEFENDANT:   Joseph Klein

21.   Joseph Klein, ("Klein"), is currently the managing director of Gauss Capital Advisors, LLC, a financial consulting and investment firm focused on biopharmaceuticals. Klein founded Gauss in 1998. From September 2003 until December 2008, Klein was a Venture Partner at Red Abbey Venture Partners, LP; from September 2001 - September 2002, he was a Venture Partner at MPM Capital Management, LLC; from June 1999 - September 2000, Klein served as vice president of Strategy and Development at Medical Management Corp., a developer of physician office management information systems, before the company merged with WebMD Corp. From 1989 - 1998, Klein was a healthcare investment advisor at T. Rowe Price Associates, Inc., where he was the founder of its Health Sciences Fund. He is currently on the board of directors of Isis Pharmaceuticals, Inc. and Savient Pharmaceuticals, Inc. He has previously served on the board of directors of: BioMarin Pharmaceuticals, Inc., Clinical Data, Inc., NPS Pharmaceuticals, Inc., OSI Pharmaceuticals, Inc. and PDL BioPharmaceuticals, Inc. Klein received his B.A. in Economics from Yale and his MBA from Stanford University.   In 2011, Klein was appointed to Advanced BioHealing's board of directors and was a board member at the time Shire acquired Advanced

---

[10]   See Exhibit E, Red Abbey Venture Partners press releases.

BioHealing. He is an "audit committee financial expert" according to Securities & Exchange Commission rules. [11]



---

[11] See Exhibit E, Red Abbey Venture Partners press releases.















## STATUTORY AND REGULATORY BACKGROUND

A.      Medicare and Medicaid

30.      Medicare is a federally-funded health insurance program primarily benefitting the elderly. Medicare Part A, the Basic Plan of Hospital Insurance, covers costs of inpatient hospital services. Medicare Part B helps cover the cost of doctor's services and outpatient care, as well as other medical services not covered by Part A. Medicare Part D helps cover patients' prescription drug costs.

31.      Medicaid is a program funded jointly by the federal and state governments to provide health care for certain people, primarily the poor and disabled.

32.      Beginning in 2006, Advanced BioHealing, and since 2011 Shire Regenerative, have provided hundreds of  thousands of Dermagraft treatment products to thousands of elderly and disabled patients whose benefits are paid by the federal government under either the Medicare, Medicaid or other federally-funded health care  programs. Advanced BioHealth and Shire Regenerative have each received millions of dollars annually as reimbursement from the federal government in payment for the Dermagraft wound healing product funded under Medicare,



Medicaid, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, Veteran's Administration-funded health insurance programs, Medicare Part D Plans and other government-funded health insurance programs.

**B.     The Anti-Kickback Statute**

33.     The Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions will improperly and adversely affect the decision about who is the optimal health care provider for a given situation, and results in the provisions of goods and services that are medically unnecessary, or poor quality, or even harmful to a vulnerable patient population. To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a prohibition against payment of kickbacks in any form, regardless of whether the particular kickback annually gives rise to overutilization or poor quality of care.

34.     The Federal Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program. 42 U.S.C. § 1320a-7(b)b. Under this statute, health care companies may not offer or pay - and sources of patient referrals may not solicit or receive - any remuneration that is intended to induce the purchase, order or recommendation of any good, facility, service or item that may be paid for, in whole or part, by a federal health care program. The law thus prohibits any kind of payment by Advanced BioHealing or Shire Regenerative to a health care provider in cash or kind, which has as one of its purposes the inducement of the health care provider to purchase the Dermagraft wound healing product.

35.     The statute defines impermissible "payments" broadly as: "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1320a-7b(b)1.

36.    No exception to the prohibition in Section 1320a-7b(b) of the Anti-Kickback Statute apply in this case.

37.    Violation of the Anti-Kickback Statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. §§ 1320a-7(b), 1320a-7a(a)(7). These monetary penalties may be up to $50,000 for each act in violation of the Anti-Kickback Statute and damages of up to three times the amount of the remuneration offered or paid. 42 U.S.C. § 1320a-7(b).

38.    Compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under Medicare, Medicaid, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, Veteran's Administration-funded health insurance programs, Medicare Part D Plans and other government-funded health insurance programs. Such compliance is also a precondition for payment under these programs.

## GENERAL ALLEGATIONS

**A.    The History of Dermagraft**

39.    Advanced BioHealing's initial round of capital investment of $8 million occurred in November 2005, and was co-led by Defendants, Canaan and Wheatley, which placed Defendants, Dr. Bloch, Dr. Dantzker and Canaan's "Executive in Residence," ███ on the company's board of directors. ███ also became the interim CEO of Advanced BioHealing while also serving as Canaan's Executive in Residence. Beginning not later than May 2006, Defendants, Dr. Bloch, Dr. Dantzker and Rakin, developed, devised, created and initially arranged funding for the fraudulent marketing schemes for Advanced BioHealing to use to sell Dermagraft in violation of the AntiKickback Statute and the False Claims Act. Dermagraft consists of a bio-absorbable mesh scaffold that can be seeded with human fibroblast cells, which grow in the scaffold, secreting collagen and other substances resulting in a three-dimensional skin substitute made of living cells. Defendants, Dr. Bloch, Dr. Dantzker and ███ fully knew that such fraudulent marketing schemes

- 22 -

and fraudulent sales of Dermagraft would be reimbursed by the Government, including Medicare and Medicaid, with Canaan and Wheatley providing the initial funding for such schemes. In May 2006, with this initial financing, Advanced BioHealing purchased the assets and rights associated with Dermagraft, from Smith & Nephew. On May 31, 2006, in at least three press releases, Defendant, Dr. Bloch, who was chairman of the Advanced BioHealing board at the time, stated that, "Our investment focus stresses rapid market entry, and we are delighted that this asset purchase will provide Advanced BioHealing with near-term revenues and the commercial infrastructure necessary for the company's additional products in development." [18]

40.     In January 2007, the Medicare reimbursement amount for Dermagraft more than doubled as a direct result of representations made to Medicare by Advanced BioHealing. On February 27, 2007, a second, and the largest, round of capital investment totaling $25.5 million was funded by Defendants, Canaan, Safeguard, Wheatley, Channel and Red Abbey, with Safeguard and Channel placing Defendants, Dr. Kurtzman and Winslow, on the board and Red Abbey establishing Defendant, Zuga, as a board observer. These Defendants joined the conspiracy begun by Defendants, Dr. Bloch, Dr. Dantzker            with full knowledge of the said fraudulent marketing practices that Advanced BioHealing was either using or planning to use, to overcharge the Government, in violation of the AntiKickback Statute and the False Claims Act, including the "Buy Five, Get One Free Scheme," the "Dosing Study Scheme," the "Off Label Marketing Scheme" and the "Selling On The Spread Scheme." According to press releases at the time, this round of financing "will be used to execute the launch and expand the market for Dermagraft . . ." In other words, the Defendants now had sufficient seed capital to begin paying unlawful kickbacks to healthcare providers to induce them to use Dermagraft and then to submit fraudulent claims to Medicare, Medicaid and other Government agencies for reimbursement. According to Defendant, Dr. Bloch, he had "met scores of

---

[18]   See Exhibit I, Press Releases.

physicians who are thrilled to again have access to Dermagraft . . ." In June 2007, an additional $4.5 million in capital financing was funded by Defendants, Safeguard, Red Abbey, and CDIB BioSciences. Based on further representations by Advanced BioHealing ███████████ the Medicare reimbursement amount for Dermagraft increased again in July 2007. Red Abbey placed Defendant, Joseph Klein, on the Advanced BioHealing board of directors in early 2011, before its sale to Shire. [19]

41.    By June of 2007, Defendants, Canaan, Safeguard, Wheatley, Channel and Red Abbey had invested a combined total of approximately $40 million in Advanced BioHealing, with full knowledge of the company's fraudulent marketing practices. They took equity ownership positions in the company commensurate with their respective capital investments as follows:

| Defendant | Shares | % Of Total Shares |
|---|---|---|
| Canaan | 12,357,632 | 40.7 |
| Safeguard | 7,807,600 | 28.1 |
| Wheatley | 4,150,737 | 14.7 |
| Channel | 1,804,363 | 6.5 |
| Red Abbey | 1,082,614 | 3.9 |

Canaan, Safeguard, Wheatley and Channel each placed a member on the board of directors. Red Abbey placed Matt Zuga, its partner, as an observer on the board.

42.    On May 17, 2011, at the time of the sale of Advanced BioHealing to Shire, three revealing press releases occurred. First, a Wall Street Journal article reported that "the idea for Advanced BioHealing was born in the Westport offices of Canaan General Partner, Stephen Bloch, who saw opportunity to build a business around regenerative-medicine assets acquired from other companies." Dr. Bloch was also described as "the father of the bride, (Advanced BioHealing)." At

---

[19]    See Exhibit J, Press Releases.

the time, Dr. Bloch had been chairman of the board of directors of Advanced BioHealing since November 2005. Second, the New York Times reported that "Canaan and some other investors obtained rights to the product [Dermagraft] and started Advanced BioHealing, which is profitable and had revenue of $146.7 million in 2010, up from $8.6 million in 2007." Third, Reuters reported that, "Canaan guided its executive in residence, Kevin Rakin, into the CEO's role at the company [Advanced BioHealing]." On May 18, 2011, Mike Cola, President of Shire's specialty-pharmaceutical business admitted to Bloomberg News reporter, Pat Wechsler, that, "Shire had talked with Westport, Connecticut-based Advanced BioHealing about a potential acquisition since 2008 . ."[20]



---

[20]   See Exhibit K, Press Releases.



44.      The Medicare reimbursement product code number for Dermagraft is J7342. The

Medicare reimbursement amounts for one square centimeter of Dermagraft from October 2006

through April 2008 were the following:

| | |
|---|---|
| Oct. 2006 | $13.87 |
| Jan. 2007 | $31.66 |
| Apr. 2007 | $31.65 |
| July 2007 | $36.75 |
| Oct. 2007 | $36.75 |
| Jan. 2008 | $36.73 |
| Apr. 2008 | $36.70.[22] |

[22]   See Exhibit M, Medicare Record.

The 2 inch by 3 inch Dermagraft pieces marketed by Advanced BioHealing were 37.5 square centimeters in size. In October 2006, the total Medicare reimbursement for one piece of Dermagraft was only $520.12. But in January 2007, ████████████████████████████ the Medicare reimbursement more than doubled to $1,187.25 and increased again in July 2007 to $1,378.12/piece. Not insignificantly, Advanced BioHealing's major capital investment of $25.5 million from Defendants, Canaan, Safeguard, Wheatley, Channel and Red Abbey, occurred in February 2007, one month after the Medicare reimbursement for Dermagraft more than doubled. The final round of capital investment funded by Defendants, Safeguard and Red Abbey, occurred later in 2007 at about the same time Medicare reimbursement increased from $1,187.25 to $1,378.12.

**B.      Corporate Governance Of Advanced BioHealing-The Board of Directors**

45.      The board of directors of Advanced BioHealing had the responsibility for the oversight of the company's risk management processes and, either as a whole or through its committees, to regularly discuss with management the company's major risk exposures, their potential impact on the company's business and the steps to take to manage the risk. The board's risk oversight process included receiving regular reports from board committees and members of senior management to enable the board to understand the company's risk identification, risk management and risk mitigation strategies with respect to areas of potential material risk, including operations, finance, legal, regulatory, strategic and reputational risk.

46.      The Audit Committee, which in May 2011 was composed of Defendants, Klein, Dr. Bloch and Winslow, was responsible to review information regarding liquidity and operations and to oversee the company's management of financial risk. Periodically, the Audit Committee reviewed the company's policies with respect to risk assessment, risk management, loss prevention and regulatory compliance. Oversight by [the committee] included direct communication with external auditors and discussions with management regarding significant risk exposures and the actions

manage nent [would] take to limit, monitor or control such exposures. The Compensation Committee was responsible for assessing whether any of [the company's] compensation policies or programs has the potential to encourage excessive risk-taking.

47.     Matters of significant strategic risk [were] considered by [the Advanced BioHealing] board as a whole.

48.     On April 15, 2011, Defendants, Dr. Bloch, Dr. Kurtzman, Dr. Dantzker, Winslow, Klein ████████ each signed Advanced BioHealing's Amendment No. 2, to the Form S-1, Registration Statement filed with the Securities & Exchange Commission in connection with the proposed initial public offering of Advanced BioHealing stock. In that filing, said Defendants each personally acknowledged their personal knowledge of the legal and business risks presented by any violation by Advanced BioHealing of the False Claims Act, the Anti-Kickback Statute, Medicare and Medicaid rules and regulations and the Food & Drug Administration rules and regulations, including, but not limited to selling Dermagraft off-label. Because of each said Defendant's extensive experience in the medical field or their prior leadership and executive experiences in pharmaceutical or medical device or medical services businesses or as consultants to, or analysts of, such businesses, they each had known of these legal and business risks even before they were first appointed to the Advanced BioHealing board of directors. Defendant, Zuga, also knew of the said legal and business risks beginning at least in February 2007, when he became an observer to the Advanced BioHealing board of directors, until he was replaced by Defendant, Klein, who became a board member in 2011.

49.     Beginning in February 2007, Advanced BioHealing began to actively build its sales force and vigorously market Dermagraft for diabetic foot ulcers, for which it had FDA approval, and also to unlawfully market and sell Dermagraft for the treatment of venous leg ulcers, for which it did not have FDA approval. To implement and promote "rapid market entry" of its Dermagraft product, Advanced BioHealing and Defendants, Dr. Bloch, Dr. Dantzker, Dr. Kurtzman, Winslow, Zuga, Canaan, Safeguard, Wheatley, Channel, Red Abbey, ████████████████████

████████████ beginning no later than February 2007, combined, conspired and entered into agreement to devise, create, fund or carry out fraudulent, unlawful marketing schemes that violated the False Claims Act, the AntiKickback Statute, Medicare and Medicaid rules and regulations and FDA rules and regulations. Those fraudulent marketing schemes specifically included the "Buy Five Get One Free Scheme," the "Dosing Study Scheme," the "Selling Off Label Scheme" and the "Selling On the Spread Scheme." Defendant, Klein, joined the said conspiracy in 2011, with full knowledge of said wrongful conduct.

**C.   The Relator's History With Advanced BioHealing**

50.   In May 2007, Webb was personally recruited, interviewed and hired ████████ ████████████████████ as an "Advanced Technology Specialist" or sales representative. She was told that part of her compensation included approximately 14,000 unvested shares of Advanced BioHealing stock based on her performance. Her first day of work was June 18, 2007. Within days, Webb was sent to La Jolla, California for five days of training at the company's production facility. During this training ████████████ conducted a training session about selling Dermagraft on the spread, in other words, telling the doctor that he could charge and be paid by the government agency, (i.e. Medicare, Medicaid, etc.), more than Advanced BioHealing would charge him for Dermagraft so that he, the doctor, could pocket the difference. ████████████

██████████████████████████████████████████████████████

51.   During this training, Webb was told ██████████████████ that she had a monthly expense account of $7,000 per month or more if needed. ██████████ ████████ repeatedly emphasized that Advanced BioHealing had not signed the Pharma Guidelines so that its sales representatives could do anything they wanted to do to "wine and dine" their doctor clients and the doctor's staff. Said Defendants also instructed Webb about using the "Buy Five, Get One Free Scheme," the "Dosing Study Scheme," and selling Dermagraft off label for

treatment of venous leg ulcers even though the product did not have approval for such clinical presentations.

52. During this training and throughout her employment with Advanced BioHealing, ██████████ repeatedly emphasized that every graft you sell will help contribute to the "Go Public" price of Advanced BioHealing stock and would therefore increase the value of every sales representative's stock options in the company. ████████ also stressed the importance of courting favor with the staff of the doctors on whom they were calling by providing staff members with Starbucks gift cards, gifts, edible gifts, massages, lunches, dinners, $100 gift cards when a nurse filled out an insurance approval form for Dermagraft, etc.

53. After training, Webb began making sales calls in her Tennessee and Kentucky territory. In the first few months of her employment, Webb did not have a sales quota to meet. ██████████ urge her to use all of her monthly $7,000 expense account to grow her territory and to buy gifts for doctors and their staffs to increase her sales of Dermagraft. ██████████ emphasize to the doctors in her territory the "Buy Five, Get One Free Scheme," the "Dosing Study Scheme," using Dermagraft to treat venous leg ulcers, off-label and selling Dermagraft on the spread. Webb refused to use these schemes in her sales activities on behalf of Advanced BioHealing.

A.     The "Buy Five, Get One Free" Fraudulent Marketing Scheme

54. Defendants, Advanced BioHealing, Shire Regenerative, Canaan, Safeguard, Wheatley, Channel, Red Abbey, Dr. Bloch, Dr. Dantzker, Dr. Kurtzman, Winslow, Zuga, Klein, ██████████ devised, created, funded, implemented or approved of the "Buy Five, Get One Free Scheme," a fraudulent marketing scheme that violated the Federal False Claims Act and the Federal Anti-Kickback Statute. Furthermore, said Defendants agreed and conspired among themselves and with the customers of Advanced

- 30 -

BioHealing and Shire Regenerative, including, but not limited to, Orlando Foot & Ankle of Orlando, Florida, to use the "Buy Five, Get One Free Scheme" to violate the Federal False Claims Act and the Federal Anti-Kickback Statute.

55.    Beginning at training, Webb was told about the "Buy Five Get One Free" scheme on several occasions ███████████████████████████████████████████ to use the said marketing scheme to increase sales in her territory. ████████████████ that the scheme was used successfully in Florida at Orlando Foot & Ankle to increase sales of the Dermagraft product.

56.    The scheme was discussed and explained further at a regional sales meeting in Orlando, Florida, January 7-9, 2008, at the Orlando World Center Marriott Resort & Convention Center, 8701 World Center Drive, Orlando, Florida 32821 ████████████████████





57.   As described to Webb ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the "Buy Five, Get

One Free Scheme" worked in the following way:

The health care provider customer would,

(1)   Order five Dermagraft Products;

(2)   Receive six Dermagraft Products;

(3)   Only be billed by Advanced BioHealing for five Dermagraft Products;

(4)   Then sell each of the six Dermagraft Products to its patients for wound healing therapy;

(5)   Then bill Medicare, Medicaid or some other federal government-funded health insurance program for all six Dermagraft Products and falsely certify that they had complied with all applicable federal laws and regulations;

(6)   Receive reimbursement payments from Medicare, Medicaid or some other federal government-funded health insurance program for all six Dermagraft Products;

(7)   Only pay Advanced BioHealing for five Dermagraft Products;

(8)   Pocket the reimbursement payment of approximately $1400 received for the sixth, "free," Dermagraft product as an illegal rebate or kickback.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ this exact "Buy Five, Get One Free" scheme was used successfully in 2007 and 2008 in the Orlando, Florida area to increase Dermagraft sales with Advanced BioHealing customer, Orlando Foot & Ankle, which necessarily required Orlando Foot & Ankle to make false certifications to Medicare, Medicaid and other federally-funded health care programs to obtain reimbursement for the Dermagraft product.

58.     The "Buy Five Get One Free" scheme was knowingly and intentionally devised, created, funded or implemented by each of the Defendants to make rebate and kickback payments to Advanced BioHealing's healthcare provider customers to induce them to order Dermagraft Product. The Defendants knew that Medicare, Medicaid or some other federal government-funded health insurance program would receive a false billing containing a false certification from a health care provider and then would rely on such false submissions to reimburse the health care provider customer for the cost of the Dermagraft product. Each Defendant also had actual knowledge that such rebates and kickbacks were violations of the Anti-Kickback Statute and the False Claims Act but directed, funded or authorized the making of such unlawful payments willfully and intentionally.

59.     During the regional sales meeting in Orlando, Florida, January 7-9, 2008, Relator, Webb, was told by other Advanced BioHealing sales representatives, including ██████████ and Carol Grey that they were using the "Buy Five, Get One Free" scheme, the "Dosing Study" scheme and the "Off Label" scheme to increase sales of Dermagraft in their sales territories. During a company sales award ski trip in Vail, Colorado in February 2008, Dawn Linder told Webb that she was worried about a disgruntled employee, Mike Lince, and that he would turn the company in for its [wrongful] marketing activities and ruin this great business opportunity for her to make a lot of money. Also during the February 2008, company provided ski vacation in Vail, Colorado, Carol Grey told Webb that what an account did with the free graft "was none of our business." Webb replied that "it was our business if we were telling the account to bill for the free graft to make money." Ms. Grey replied that "we need to grow this company. No one is going to come after a small company. . . . They go after big companies." ██████████ told Webb during the ski trip that the "Buy Five Get One Free" scheme really helped him grow his territory and that "You [Webb] just need to chill out."

██████████████████████████████████████████████████████████



**B.     The "Dosing Study" Fraudulent Marketing Scheme**

61.     Defendants, Advanced BioHealing, Shire Regenerative, Canaan, Safeguard, Wheatley, Channel, Red Abbey, Dr. Bloch, Dr. Dantzker, Dr. Kurtzman, Winslow, Zuga, Klein, ████████████████████████████████████████████ devised, created, funded, implemented or approved of the "Dosing Study Scheme," a fraudulent marketing scheme that violated the Federal False Claims Act and the Federal Anti-Kickback Statute. Furthermore, said Defendants agreed and conspired among themselves and conspired with the customers of Advanced BioHealing and Shire Regenerative, including, but not limited to, Orlando Foot & Ankle of Orlando, Florida, to violate the Federal False Claims Act and the Federal Anti-Kickback Statute and to knowingly and intentionally use the "Dosing Study Scheme" to make false certification to Medicare, Medicaid and other federally-funded health care programs.

62.     Webb was told about the "Dosing Study Scheme" on several occasions ████ ████████████████████████████████ to use the said marketing scheme to increase sales in her territory. The scheme was also discussed and urged upon Webb at the Regional Sales meeting in Orlando, Florida January 7-9, 2008. ████████████████ the scheme was used successfully during 2007 and 2008 in Florida at Orlando Foot & Ankle to increase sales of the Dermagraft product. ████████████████████████████████████████

████████████████████████████████████████████████████████████

63.     ████████████████████████████████████████ the wrongful "Dosing Study Scheme" worked in the following way:

(1)      The Advanced BioHealing sales representative would tell the health care provider customer that the company was conducting a study to determine how many Dermagraft treatments were required to obtain successful wound closure and healing;

(2)      The sales representative would provide the health care provider customer with a simple form to fill out and list the number of Dermagraft treatments used for a particular patient to achieve successful wound healing;

(3)      The health care provider customer then completed the form, submitted it to Advanced BioHealing and was paid $200 for each Dermagraft treatment listed on the form;

(4)      Such $200 payments received by the health care provider customer were rebates or kickbacks and constituted gross over payments for the simple, administrative form completion task requested by Advanced BioHealing;

(5)      The "Dosing Study" was a sham study and a pretext devised by Advanced BioHealing to make rebate or kickback payments to its customers in violation of the Anti-Kickback Statute.

(6)      The "Dosing Study Scheme" was willfully and intentionally devised by the Defendants to get the customers of Advanced BioHealing and Shire Regenerative to make false certifications to Medicare, Medicaid and other federally-funded health care programs to obtain reimbursement for the Dermagraft product.

64.      The "Dosing Study Scheme" was knowingly and intentionally devised, created, funded or implemented by each of the Defendants to make rebate and kickback payments to their health care provider customers to induce them to order Dermagraft Product. The Defendants knew that Medicare, Medicaid or some other federal government-funded health insurance program would

rely upon the false certifications and reimburse the health care provider customer for the cost of the Dermagraft Product. Each Defendant also had actual knowledge that such rebates and kickbacks were violations of the Anti-Kickback Statute and the False Claims Act but directed and each Defendant authorized the making of such unlawful payments willfully and intentionally.

65.     Relator, Webb, was told by other Advanced BioHealing sales representatives, including Dawn Linder, ▮▮▮▮▮▮▮▮ and Carol Grey that they were using the "Dosing Study Scheme," to increase sales of the Dermagraft Product in their sales territories. These conversations occurred at the Regional Sales meeting in Orlando, Florida, January 7-9, 2008, and during the Vail ski vacation in February 2008.

C.     The "Off Label Scheme"

66.     Advanced BioHealing's Dermagraft product was approved by the United States Food & Drug Administration, ("FDA"), for one therapeutic use: the treatment of diabetic foot ulcers. Typically, a healthcare provider would have to apply six to ten successive Dermagraft treatments to obtain successful closure and healing of a diabetic foot ulcer. These wounds tended to be smaller. The major competitor of Advanced BioHealing was Apligraf which had FDA approved products for the treatment of diabetic foot ulcers and venous leg ulcers. Dermagraft was not FDA approved for the treatment of venous leg ulcers, which typically were much larger wounds than diabetic foot ulcers requiring the application of several treatments at a time and in succession to achieve wound closure and healing. At a cost of nearly $1400 per Dermagraft treatment, the use of the Dermagraft product to treat venous leg ulcers was a huge market. ▮▮▮▮▮▮▮▮▮▮▮ told Webb to market and sell the Dermagraft product off label for the treatment of venous leg ulcers even though the product was not FDA approved for such use. ▮▮▮▮▮▮▮▮▮▮▮ also told Webb to market Dermagraft to health care providers on the basis of the Sheehan Study results, which were not part of the package insert for the product.

67.     At the regional sales meeting in Orlando, Florida, January 7-9, 2008, █████████ ████████████████████ specifically discussed and told Advanced BioHealing sales representatives to market and sell Dermagraft for the off label treatment of venous leg ulcers. The written notes from that meeting confirm the instructions to Webb to sell Dermagraft off label. During the meeting, Webb was told by other Advanced BioHealing sales representatives including Dawn Winter, ████████ and Carol Grey that they were selling Dermagraft for the off label treatment of venous leg ulcers, which dramatically increased sales in their territories. They recommended that Webb also sell Dermagraft off label to increase sales in her Tennessee and Kentucky territory.

68.     Beginning in February 2007, Defendants, Advanced BioHealing, Shire Regenerative, Canaan, Safeguard, Wheatley, Channel, Red Abbey, Dr. Bloch, Dr. Dantzker, Dr. Kurtzman, Winslow, Zuga, Klein, ██████████████████████████████████████████████ devised, created, funded, implemented or approved of the "Off- Label" sale and marketing of Dermagraft for treatment applications not approved by the Food & Drug Administration, a fraudulent marketing scheme that violated the False Claims Act and the rules and regulations of the Food & Drug Administration. Furthermore, said Defendants agreed and conspired among themselves and with the customers of Advanced BioHealing and Shire Regenerative, including, but not limited to, Orlando Foot & Ankle of Orlando. Florida, to use the "Off Label Scheme" to violate the Federal False Claims Act and the regulations of the Food & Drug Administration.   The "Off Label" marketing scheme was knowingly and intentionally devised, created, funded or implemented by said Defendants to market and sell the Dermagraft product for treatment purposes for which it did not have the approval of the United States Food & Drug Administration. The "Off Label Scheme" was willfully and intentionally devised by said Defendants to get the customers of Advanced BioHealing and Shire Regenerative to make false certifications to Medicare, Medicaid and other federally-funded health care programs to obtain reimbursement for the Dermagraft product for off label, unapproved use. Each Defendant knew that Medicare, Medicaid or some other federal-funded health insurance

program would rely upon the false certifications and reimburse the healthcare provider, customer at the Medicare reimbursement rate for the Dermagraft product for uses not approved by the FDA. Each Defendant also had actual knowledge of the off label marketing of Dermagraft and that such wrongful marketing and sales of Dermagraft were not approved by the FDA.

**D.      Selling Dermagraft On The Spread**

69.      Beginning in February 2007, Advanced BioHealing marketed and sold Dermagraft on the difference between the Medicare reimbursement amount and the actual cost of the product paid by the health care provider. This difference is known in the industry as "the spread." The Medicare reimbursement amount, which changed approximately every quarter, was determined based on the national average unit sales price of Dermagraft. █████████████████████

███████████████████████████████████████████████████████████

Upon information and belief, ██████ failed to tell Medicare about: (1) the "Buy Five, Get One Free" product give away scheme or (2) the $200 per product kick back that was paid by Advanced BioHealing to health care providers as part of the Dosing Study scheme or (3) selling on the spread or the other fraudulent marketing practices used by Defendants to sell Dermagraft.

70.      Beginning in January 2007 and continuing until at least 2012, Advanced BioHealing and Shire, ████████████████████████████ with the knowledge, agreement and approval of each of the other said Defendants, fraudulently manipulated the Medicare reimbursement amount by giving product away and paying kickbacks. For example, with the "Buy Five Get One Free" scheme, Advanced BioHealing would book the sale of five Dermagraft units at a per unit price of $1365 but deliver six units of Dermagraft to the customer. The actual average unit price was $1137.50 but the price reported to Medicare was $1365. If the Medicare reimbursement amount was $1365 per unit, the customer received an over payment of $227.50 per unit from Medicare for the

five units actually purchased and paid for. The customer received an additional $1365 wrongful over payment for the sixth free unit for which the customer paid nothing. For every five units of Dermagraft purchased by the customer, Medicare overpaid $2,502.50, (i.e. $227.50 x 5 = $1,137.50 + $1365 − $2,502.50). The foregoing is a typical example of the fraudulent over payment by Medicare caused by the "Buy Five Get One Free" scheme.

71.     Advanced BioHealing also fraudulently manipulated the Medicare reimbursement amount with its "Dosing Study Scheme." For example, the customer would be charged $1365 per Dermagraft unit but for every unit purchased would receive a $200 per unit kickback if they would fill out a simple form about product use. The actual cost of the product was $1165 per unit but the full product price of $1365 was reported to Medicare.

72.     Since January 2007, Advanced BioHealing and Shire, through Defendant, Dixon, and others advocated with Medicare to maintain a high product reimbursement amount and provided Medicare with false product pricing information to deceive Medicare about the actual national average unit Dermagraft pricing. Medicare relied upon such false pricing information to determine the reimbursement amount for Dermagraft.

73.     Advanced BioHealing instructed its sales force, including Webb, to use the difference between the actual unit cost of Dermagraft and the Medicare reimbursement amount, (the spread), as a selling tool to market the product. Marketing and selling Dermagraft on the spread caused Medicare to pay more for Dermagraft than its actual cost and resulted in fraudulent over charges to the Government of tens of millions of dollars between 2006 and 2012. Defendants, Advanced BioHealing, Shire Regenerative, Canaan, Safeguard, Wheatley, Channel, Red Abbey, Dr. Bloch, Dr. Dantzker, Dr. Kurtzman, Winslow, Zuga, Klein, ████████████████████████████ ████████████ each knew about the false and fraudulent practice of selling Dermagraft on the spread and that such practice was a violation of the AntiKickback Statute and The False Claims Act. Each such Defendant agreed and conspired with each other and conspired with the

customers of Advanced BioHealing and Shire to sell and market Dermagraft on the spread in violation of the AntiKickback Statute and the False Claims Act.

**COUNT ONE**
**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. §§ 3729(a) *et seq.* (Advanced BioHealing, Shire**
**Regenerative, Shire, Canaan, Safeguard, Wheatley, Channel, Red**
**Abbey, Dr. Bloch, Dr. Dautzker, Dr. Kurtzman, Winslow, Zuga,**
**Klein,** ██████████████████████████████████████

74.     Webb re-alleges and reincorporates by reference the allegations contained in Paragraphs 1 through 73 of this Third Amended Complaint.

75.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

76.     Before May 20, 2009, 31 U.S.C. §§ 3729(a) provided, in relevant part, liability against any person who:

> (1)     knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

> (2)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or],

> (3)     conspires to defraud the Government by getting a false or fraudulent claim allowed or paid . . . .

77.     On May 20, 2009, 31 U.S.C. §§ 3729(a) was amended to provide, in relevant part, liability for:

> (1)     any person who:

>> (A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

>> (B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

- 40 -
